Henry GONZALEZ, et.al., Plaintiffs,

v.

**FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, DIVISION OF FLORIDA HIGHWAY PATROL, Defendant.**

**No. 99–2971–CV–HOEVELER.**

United States District Court, S.D. Florida.

Feb. 6, 2002.

1340

Carlos Garcia, Garcia & Dominguez, Miami, FL, for Plaintiffs.

Helen Ann Hauser, Dittmar & Hauser, Coconut Grove, FL, for Defendants.

*ORDER GRANTING DEFENDANT'S MOTIONS FOR FINAL SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR SANCTIONS; GRANTING DEFENDANT'S MOTION FOR ORDER COMPELLING DISCOVERY AND DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER GRANTING DEFAULT*

HOEVELER, District Judge.

THIS CAUSE comes before the Court on the Defendant's Amended Motions for Summary Judgment as to each Plaintiff, filed October 23, 2001. The Plaintiffs elected to stand on their original responses, filed in March of 2001. *See* Pls.' Resp. Am. Mot. Summ. J. at 1. The Court held a hearing on the motions on January 30, 2002. This Order also addresses the Defendant's Motion for Sanctions, filed July 25, 2001; the Defendant's Motion for an Order Compelling Discovery, filed August 2, 2000; and the Plaintiff's Motion for Reconsideration of Order Granting Default, filed January 24, 2002.

### Table of Contents

1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1345

2. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1345

3. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1346

4. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1346
 A. Manual Sanchez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1346
 a. failure to promote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1347
 b. denial of the morning shift . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1348
 c. negative comments In file . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1348
 d. air conditioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1349
 e. discipline for failing to appear in court . . . . . . . . . . . . . . . . . . . . . 1349
 f. hostile work environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1349
 g. off-duty suspensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1350
 B. Wanda & Jorge Diaz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1352
 a. denied promotional opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . 1353
 b. exclusion from training classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1353
 c. old equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1353
 d. failure to transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1354
 e. hostile work environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1354
 f. acts of discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1355
 g. off-duty work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1356
 h. compensation for commuting time . . . . . . . . . . . . . . . . . . . . . . . . . . 1356

 i. removal of letters of commendation ...................................... 1357
 j. delay in approving residence .......................................... 1358
 C. **Orlando Alverez** ...................................................... 1358
 a. disparate treatment claim ........................................... 1358
 b. hostile work environment .......................................... 1362
 D. **Pedro Cortez** ........................................................ 1362
 a. dismissal from work ............................................... 1362
 b. other claims ...................................................... 1365
 E. **Angelo Santisteban, Henry Gonzolez and Alejandro Diaz** .................. 1365
 a. dismissal ......................................................... 1365
 b. other claims ...................................................... 1367

5. **EEOC Charge** ......................................................... 1369

6. **State Law Claims** ..................................................... 1369

7. **Conclusion** .......................................................... 1369

### Background

On November 4, 1999, Plaintiffs Henry Gonzalez, Alejandro Diaz, Wanda Diaz, Pedro Cortes, Jorge J. Diaz, Manuel Sanchez, Orlando Alverez, Angelo Santiesteban filed their Amended Complaint, alleging violations of Title VII (Count I), Retaliation (Count II) and the Florida Civil Rights Act of 1992 (Count III). The Plaintiffs asserted multiple violations of the Civil Rights Act including unequal disciplinary action (Am.Compl.¶ 12), unequal pay (¶ 15, 16), hostile work environment (¶ 15) and unequal promotional opportunities (¶ 17). The Defendant filed eight motions for summary judgment arguing that in each instance, the Plaintiffs either failed to state a prima facie case, were unable to present any evidence that the Defendant's legitimate nondiscriminatory explanation was pretextual, or the Plaintiffs' claims were untimely filed, barred by collateral estoppel, waived by settlement, or not "significant and material" changes in employment.[1]

### Facts

Florida Highway Patrol ("FHP") troopers and supervisors are allowed to supplement their salaries by working off-duty for private employers, but there are limitations on the number of hours they are allowed to engage in such off-duty work. In addition, they are required to submit a Request to Work Secondary Employment and get authorization from their supervisors. Troopers are required to report the number of hours which they work and reimburse FHP for mileage on their patrol vehicles. Some troopers do not report their off-duty hours to the FHP, in violation of the rules, in order to earn more income. These troopers who "stealth," as it is referred to, are subject to strict discipline if caught. In 1995, most of the Plaintiffs began "stealthing" at PCL, a construction company that was erecting tollbooths on the Florida Turnpike. After being caught, they admitted to numerous FHP violations. Plaintiff Manual Sanchez's violations were deemed to be isolat-

---

**1.** In this case the Plaintiff's Amended Complaint and pleadings allege scores of minor acts of "discrimination," making this an excellent example of a "shotgun" or "scattershot" complaint. *See Miller v. Smith,* 584 F.Supp. 149 (D.D.C.1984) ("The scattershot approach used in this complaint, without consideration of rules of law and procedure,

whether judicial or administrative, inevitably leads to the result that most of the claims must be dismissed.") For an *enlightening* discussion on the negative effects of scattershot pleadings on the parties and the judicial system and the sanctions that tend to follow the filing of such pleadings, see *Byrne v. Nezhat,* 261 F.3d 1075 (11th Cir.2001).

ed incidents, and thus, he entered into a settlement agreement with FHP, received an administrative punishment, and is still employed with FHP. Orlando Alverz entered into a settlement agreement, in which he accepted a demotion. No allegations of violations of off-duty policies have ever been sustained against Wanda or Jorge Diaz and no action has been taken against them. Pedro Cortes, the scheduler for PCL was fired and prosecuted for grand theft, and conspiracy. Henry Gonzalez, Angelo Santisteban and Alejandro Diaz were fired from FHP. Shortly after these actions were taken, these Plaintiffs filed charges and after receiving permission from the EEOC, brought suit in this Court.

### Summary Judgment Standard

Rule 56(C) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate only where the moving party is entitled to judgment as a matter of law. A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party who moves for summary judgment bears the initial burden "to show the district court, by reference to materials on file, that there is no genuine issue of

material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). A court must view the evidence presented in a light most favorable to the non-moving party.

However, once the moving party meets his initial burden, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608. The non-moving party may not rest upon mere allegations or denials in his pleadings, but must set forth specific facts, through affidavits or the other forms of evidence provided for by the rules. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Essentially, "the inquiry ... is ... whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. With this standard in mind, we address Defendant's Motions for Summary Judgment.

### Analysis

### I. *Manual Sanchez*

Mr. Sanchez appears to base his claims on the fact that (1) he was never promoted; (2) he was denied working on the morning shift; (3) his file was "papered" with negative comments; (4) he was temporarily made to work in a vehicle with no air conditioning; (5) he was disciplined for not testifying in Court on a different matter and (6) he was subject to a hostile work environment and; (7) he had privileges suspended twice for minor infractions.[2]

---

**2.** The Court limits its discussion in this Order to those "adverse actions" stated with particularity in the Plaintiffs' Amended Complaint or each Plaintiff's Memorandum In Opposition To Summary Judgment. General allega-

tions and specific allegations made elsewhere in the record (e.g. the Plaintiffs' depositions) but not stated with particularity in the Complaint or each Plaintiff's Memorandum have

The Court will discuss each allegation in turn.

### 1. Failure To Promote

█ To establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997). In the present case, the Plaintiff concedes that he never applied for any promotion. Generally, this would prevent the Plaintiff from recovering on this theory. *McKinney v. Boyd Gaming Corp.,* 2001 WL 711633 at 600 (9th Cir.2001) ("Since McKinney concedes he never applied for the job which he was denied, he cannot establish a prima facie case of discrimination under Title VII.")

█ A plaintiff may still establish a prima facie case without demonstrating that he applied for a position, if instead, he shows that an application would have been futile due to the employer's discriminatory practices. *See Taylor v. Hudson Pulp and Paper Corp.,* 788 F.2d 1455, 1462 (11th Cir.1986)("[It] is clear that a nonap-plicant may establish a *prima facie* case by showing that due to the employer's discriminatory practices the application would have been a futile gesture."); *Henson v. City of Dundee,* 682 F.2d 897, 911 n. 22 (11th Cir.1982); *International Broth. of Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977). Mr. Sanchez attempts to do this by arguing that his "file has been 'papered' with negative discipline so that he is unable to promote." *See* Sanchez Mem. Opp. Summ. J. at 13.

█ The Defendant, however, testifies and the Plaintiff does not dispute that all of his performance evaluations are "meets standards," and the file only indicates that he has been disciplined three times in the ten years that he has worked with the Defendant. *See* Harrington Aff. at 7. The Plaintiff actually concedes that he engaged in the three different activities which lead to discipline. Moreover, the Plaintiff has presented no evidence that his file is any more damaging to his ability to be promoted, than the file of any other employee, white, or Hispanic. The Plaintiff has testified that he is in good standing at work and that he does not expect problems in the near future. *See* Sanchez Dep. at 79–80. Thus, the Plaintiff can not show that it would have been futile for him to apply for a promotion.[3] Therefore, summary judg-

---

been considered by the Court but are not discussed in this Order.

**3.** Additionally, the Plaintiffs have provided the Court with what appears to be hundreds of pages of computer generated tables which they intend as statistical evidence of discrimination. The Defendant argues that the Court can not consider statistics in an employment discrimination case unless they are interpreted by an expert witness. While the Court does not decide today whether a party must present an expert witness to analyze statistical evidence, the Court will not consider a party's statistical evidence, where the party itself does not even present the Court with an anal-ysis of its statistics, unless of course the evidence is so clear and simple that no analysis is necessary (which is not the case here). Thus, a party would have to at least state, for instance, that the statistics it has presented show that only X % of Hispanic employees were promoted in their Troop, whereas the Florida average is Y % and the national average among Highway Patrols is Z %. Without such analysis the Court can not determine whether the Plaintiff has presented a triable issue as to whether there has been any actionable discrimination, and the Defendant can not properly rebut the Plaintiffs' evidence. Instead, in this case, the Plaintiffs provide vague and conclusory statements such as "the

ment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on the Defendant's failure to promote the Plaintiff.

### 2. Denial of the Morning Shift

■ Mr. Sanchez argues that the Defendant denied his request to work the morning shift even though he had sufficient seniority. *See* Sanchez Mem. Opp. Summ. J. at 15. In order to establish a prima facie case of discrimination based on a failure to transfer Sanchez to the morning shift, he must show, *inter alia*, that he suffered an adverse employment action. *See Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir.2000). The Defendants argue that the failure to transfer the Plaintiff to a different shift does not constitute an adverse employment action. This Court agrees. For there to be an adverse employment action for purposes of a prima facie case of discrimination in employment, there must be a serious and material change in the terms, conditions, or privileges of employment. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir.2001). A lateral transfer, that is a transfer which does not involve a demotion in form or substance, does not rise to the level of an adverse employment action. *See Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1449 (11th Cir.1998). A transfer to a different position can be adverse if it involves reduction in pay, prestige or responsibility. *See Hinson*, 231 F.3d at 829. "The flip side of this coin would appear to be that a failure

to transfer may constitute an adverse employment action if [the new position] entails an increase in pay, prestige or responsibility." *Smith v. Alabama Dept. of Corrections*, 145 F.Supp.2d 1291, 1297 (M.D.Ala.2001) (quoting *Morris v. Wallace Comm'y College*, 125 F.Supp.2d 1315, 1328 (S.D.Ala.2001)). In the present case, the Plaintiff has not alleged that a transfer to the morning shift would represent an increase in pay, prestige or responsibility. Therefore, this failure to transfer does not represent an adverse employment action for purposes of a prima facie case of discrimination in employment. Moreover, the Plaintiff was able to obtain the shift he wanted through the grievance process. Clearly, the Plaintiff can not meet the high burden established in *Davis*. Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on the Defendant's failure to transfer the Plaintiff to a different shift.

### 3. Negative Comments In File

■ The Plaintiff argues that negative comments were placed in his file. However, "a negative performance evaluation which is not used as the basis for any action against a plaintiff does not constitute an adverse action." *Simmons v. Neumann*, 1999 WL 1893667 at *13 (S.D.Fla. 1999). As in *Simmons*, in the present case, the Plaintiff has presented no evidence that any of the evaluations, papers, or comments were used as the basis for any action against the Plaintiff.[4] Addition-

---

statistical data comprising Florida Highway Patrol's workforce is very anglo male dominated in every category." *See* Gonalez Mem. Opp. Summ. J. at 8. This simply is not enough.

Besides providing the Court with some analysis of its statistics, the Plaintiff must also state a conclusion that it wishes the Court draw from its statistics which is both (a) spe-

cific and (b) relevant to the case at bar. In this case, the Court will not draw conclusions from the Plaintiffs' statistics as the Plaintiffs themselves have drawn no specific and relevant conclusions.

4. To the extent some of these "papers" were disciplinary records, the Plaintiff was obviously disciplined based on them. However,

ally, the Plaintiff has testified that he is in good standing at work and that he does not expect problems in the near future. *See* Sanchez Dep. at 79–80. If the Plaintiff's file was "poorly done and unsupported, it might be a poor way to run the . . . office, but it would not be actionable under Title VII." *Id.* at *14. Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on any negative comments placed in the Plaintiff's file.

### 4. Air–Conditioning

■ The Plaintiff alleges that the fact that he was made to temporarily work in a vehicle with no air-conditioning when his vehicle broke down is an example of improper discrimination. *See* Sanchez Mem. Opp. Summ. J. at 19. As stated earlier, to prove an adverse employment action in a case under Title VII, an employee must show a "serious and material" change in the terms, conditions, or privileges of employment. *See Davis,* 245 F.3d at 1232. In this case, however, the Plaintiff promptly complained about his vehicle and the condition was remedied. *See* Def.'s Ex. D, Sanchez's Answers To Second Set of Interrogatories, # 9 ("That same day, I was issued a spare patrol car with a working air-conditioner.") Clearly, this can not constitute an adverse employment action under *Davis.* Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on being temporarily assigned a car without air conditioning.

### 5. Discipline For Failing To Appear In Court

■ Sanchez argues that he was told by a superior that he was required to appear in Court on an unrelated matter during his off-duty period. When the Plaintiff re-

fused, his ability to work off-duty was suspended. However, after the Plaintiff filed a grievance, the discipline was removed immediately. *See* Def.'s Ex. 4. Therefore, this too can not constitute an adverse employment action under *Davis.* Moreover, the Plaintiff has not presented evidence of any similarly situated employee, as he is required to make out a prima facie case. *See Silvera v. Orange County School Board,* 244 F.3d 1253, 1259 (11th Cir.2001). Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on being disciplined for failing to appear in Court.

### 6. Hostile Work Environment

■ The Plaintiff's claim that he was subject to a hostile work environment amounts to a handful of comments which he found to be demeaning. Lt. Claremon Davis allegedly stated that with regards the investigation of Sanchez, "he got what he deserved." *See* Sanchez Dep. at 172. Captain Thomas Cowart told a transferred trooper that as long as he stayed away from "several Hispanic troublemakers" he would not have any problems. *Id.* at 173. Sanchez and the other troopers accused of conspiracy were referred to as the "Magnificent Seven." *Id.* at 188–89 Finally, Sgt. Heath allegedly told Sanchez that Lt. Vaughn said that "excluding Trooper Mead (who was white), everyone in his squad were pieces of shit (everyone else was Hispanic)." *See* Def.'s Ex. D, Sanchez's Answers To Second Set of Interrogatories, # 4.

■ To succeed with his hostile environment claim Sanchez must demonstrate that the actions of the Defendant altered the condition of the workplace, creating an objectively abusive and hostile

this discipline is discussed as a separate claim *infra.*

atmosphere. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–24, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted). For example, the racial slurs allegedly spoken by coworkers had to be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *Edwards*, 49 F.3d at 1521 (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990)). In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. *Id.* (citing *Harris*, 510 U.S. at 24–25, 114 S.Ct. at 372.)

In this case, Sanchez does not even come close to stating a claim. As to frequency, the Plaintiff has only come forward with a handful of allegedly discriminatory comments, made by different employees over a ten year period. As to severity, many, if not most, of these comments do not appear to be related to race at all. For instance, Lt. Claremon Davis' comment that Sanchez got what he deserved, appears to be unrelated to race. Additionally, the reference to the seven conspirators as the "Magnificent Seven" does not appear to be related to race, and is not even obviously derogatory. Even those which may have been related to race can not be said to be severe. Some of the comments were not made in the presence the Plaintiff and some require the hear-er to make an inference to even discover that they are related to race.

Similarly, the comments can not be found to be threatening or humiliating. The few comments that are in anyway troubling were not even made in the presence of the Plaintiff. To the extent any of the comments are embarrassing to the Plaintiff, it seems more likely that it is because they portray him as a troublemaker, than because they portray his race in a negative light. Finally, Sanchez has presented no evidence that these comments interfered with his performance at work. Thus, Sanchez has failed to state a claim under the standards *Harris*.

On top of all this, as in *Edwards*, numerous hearsay problems exist with Sanchez' claim. *See Edwards*, 49 F.3d at 1522. ("Other alleged incidents, as the court correctly held, were purely speculation by Edwards. Still others concerned statements said to have been made to third parties by fourth parties. Apart from hearsay problems, there was insufficient information as to when the statements were made, how knowledge of them was acquired, and when Edwards was informed of them (if she was)".) As in *Edwards*, in the present case, some of these comments were made to third parties by fourth parties. And like *Edwards*, Sanchez has not always made it clear how and when he learned of such comments. Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on a hostile work environment.

### 7. Off–Duty Suspensions

■ Sanchez's argument that he was discriminated against when he was given an eight hour suspension for an accident which resulted in damage to his vehicle is easily dismissed. First, an eight hour sus-

pension is not a "serious and material change in terms, conditions, or privileges of employment" under *Davis*. This is especially true considering that Sanchez was given the alternative of attending "driving school" but instead voluntarily choose the suspension because he felt it would be embarrassing to attend "driving school." Moreover, because this incident occurred in 1992, Sanchez's EEOC complaint which was filed in 1997 was not timely. *See* discussion *infra;* Sanchez Dep. at 52. Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on his eight hour suspension in 1992.

 Sanchez also argues that he was discriminated against when he was given a thirty day suspension of his ability to work off-duty in response to off-duty policy violations. The suspension was the result of a settlement Sanchez entered with the Defendant on July 11, 1996. The Defendant filed his EEOC complaint on May 14, 1997, more than 300 days from the date of the alleged discrimination. Before a claimant can file a Title VII civil action, he must file a timely charge of discrimination with the EEOC. Florida is a "deferral state," which requires an aggrieved employee to file a discrimination charge with the EEOC within 300 days of the alleged discriminatory act. *See DeLandro v. Jackson Memorial Hosp.*, 2001 WL 1622064 at *4 (S.D.Fla.2001). The timeliness of a discrimination claim is measured from the date the claimant knows or reasonably should know that she has been discriminated against. *Id.*

In the present case, the Plaintiff knew or should have known about the discrimination by the time he agreed to sign the settlement agreement. The Plaintiff was represented by an attorney during entire time that he was negotiating the settlement agreement. The Plaintiff has testi-

fied that Trooper Christopher Veverka was a similarly situated non-minority who received less severe discipline than himself for committing more egregious acts. *See* Sanchez Dep. at 107–110. Mr. Veverka's case was closed April 2, 1996, over one month before Sanchez signed his settlement agreement. *See* Def.'s Ex. 2. Sanchez testified that he was "aware of what was going on" with regard to Mr. Veverka. *See* Sanchez Depo. at 108 ("Darby is the one that did the investigation, and I was here, and I knew it was in 1996 because I was aware of what was going on already.") Therefore, the Plaintiff should have known at the time he signed the agreement (or immediately thereafter) that he was getting a significantly worse deal then he alleges was given to Christopher Veverka.

Moreover, settlement negotiations "dragged for approximately six, seven, eight months" before Sanchez signed the agreement. *Id* at 21. Virtually every "similarly situated" individual that Sanchez presents to this Court had been disciplined before or during this negotiation period. Thus, Sanchez could have and should have found out what their discipline had been before agreeing to any settlement himself. Finally, if Sanchez's 30 day off-duty suspension was as grossly disproportionate as he suggests, this fact should have been apparent to him from the moment it was offered, let alone the moment he signed the settlement agreement.

 Sanchez also fails to establishing a continuing violation. Under the "continuing violation" theory, a cause of action is considered timely filed where a substantial nexus exists between a timely filed claim and an otherwise time-barred claim, so they may be viewed as constituting a single violation which continues into the statutory period. *See Haynes v. Shoney's, Inc.*, 1992 WL 752127 at *17 (N.D.Fla.1992). To determine whether a

nexus exists, Courts consider: the subject matter of the discrimination, the frequency of occurrences, and the degree of permanence of the violation. *Id.* First, is the subject matter of the discriminatory acts so similar that there is a substantial relationship between the otherwise untimely and timely acts? *See Crowley v. L.L.Bean,* 143 F.Supp.2d 38, 53 (D.Me. 2001). In the present case, the only remotely similar discriminatory act (the 8–hour suspension of off-duty act) occurred in 1992 and thus is also untimely. None of the other acts Sanchez complains of are similar enough and many occurred more than 300 days before Sanchez filed his EEOC complaint.

Second, are the acts isolated and discrete or do they occur with frequency or repetitively or continuously? *Id.* Here, the acts which Sanchez complains of occur infrequently and are isolated and discrete. As stated *supra,* the only similar act occurred years earlier and can not be considered anyway because it is also untimely. Third, are the acts of sufficient permanence that they should trigger an awareness of the need to assert one's rights? *Id.* With regard to the average individual, the answer to this question might be no, since it was only a thirty day suspension. However, this Plaintiff brought grievances when he was not reassigned to the shift he desired, when he was temporarily given a car without air conditioning, and when he was disciplined for failing to appear in Court. Thus, the Court believes that this Plaintiff should have been aware of the need to assert his rights, especially considering that he was being represented by an attorney in reaching the settlement agreement. In any case, in order to find a continuing violation, "the Court must answer the first two questions in the affirmative and the final question in the negative." *Id.* The Court has answered *each* of the three questions in a way that suggests that there was no continuing violation. Therefore, Sanchez can not maintain his claim based on his 30 day off-duty suspension, because he did not timely file his charge with the EEOC.[5] Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on his thirty hour suspension of off-duty work.

Finally, if this 30 day suspension of off-duty work is a "serious and material change in terms, conditions, or privileges of employment" under *Davis,* it makes the cut by a hair. Several Courts have held that denying overtime is not such a serious and material change. *See e.g. Craven v. Texas Dept. of Criminal Justice–Institutional Div.,* 151 F.Supp.2d 757, 766 (N.D.Tex.2001) (citing *Joiner v. Ohio Dep't of Trans.,* 949 F.Supp. 562 (S.D.Ohio 1996), for the proposition that "the loss of opportunity for overtime" is insufficient to constitute adverse employment action.) In this case, the ability to moonlight was only denied for thirty days. Additionally, the suspension was the result of a negotiated settlement agreement, in which Sanchez was represented by an attorney. Therefore, this Court maintains a serious doubt as to whether Sanchez's suspension meets the *Davis* requirements.

## II. *Wanda and Jorge Diaz*

Mr. and Mrs. Diaz appear to base their claims on the fact that (1) Mr. Diaz was denied promotional opportunities; (2) they were excluded from training classes; (3) their old cars and radar detectors were not timely upgraded; (4) Mrs. Diaz was not timely transferred to a different county; (5) they were subject to a hostile work

---

**5.** To the extent that the alleged violations discussed earlier occurred more that 300 days before Sanchez filed his EEOC complaint, they are also deemed waived.

environment; (6) they have been subject to discipline based on their race; (7) Mrs. Diaz was denied the ability to work off-duty during her training period; (8) they were not compensated for their commuting time; (9) letters of commendation were not placed in Mr. Diaz's file and (10) the Defendant delayed approving Mrs. Diaz's change in residency. The Court will discuss each allegation in turn.

### 1. Denied Promotional Opportunities

 Mrs. Diaz does not claim she has been unfairly denied any promotional opportunities. *See* W. Diaz Dep. at 69–70 ("Q: Do you feel that you've been discriminated against in terms of promotional opportunities? A: No.") Mr. Diaz asserts that he applied for two specialized unit and both positions were given to less senior people who were also non-Hispanic. *See* J. Diaz Mem. Opp. Summ. J. at 20. However, Mr. Diaz does not know who was selected, what their qualifications were and he never attempted to find out this information. *See* J. Diaz Dep. at 104. He does not even explain how he knows that the people selected were neither more senior nor Hispanic. In order to make out a prima facia case based on a failure to promote, a plaintiff must show, *inter alia,* that other equally or less qualified employees who were not members of the protected class were promoted. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997). Because Mr. Diaz does not know the qualifications of those selected, he cannot make out a prima facia case. Therefore, summary judgment is GRANTED with regard to Plaintiffs' Title VII claim, to the extent such claim is based on a failure to promote.

### 2. Exclusion From Training Classes

 The Plaintiffs assert that they were excluded from training classes based on their race, but they provide no evidence that this was the case. Mrs. Diaz stated that the reason she was given as to why she could not attend certain classes was that they were "shorthanded in Monroe" County. *See* W. Diaz Dep. at 71. Additionally, Mrs. Diaz testified that class size was very limited so only a handful of employees were selected from Troop E, which covers all of Monroe and Miami–Dade County. *Id.* at 73. The Plaintiffs have presented no evidence to show that these legitimate reasons for failing to accept Mrs. Diaz for various training classes were pretextual. In fact Mrs. Diaz labeled the group excluded for training classes not as Hispanic troopers, but troopers who worked in Monroe County. *Id.* at 71.

Mr. Diaz was actually accepted to several training classes but they were canceled for reasons of which he was not aware. *See* J. Diaz Dep. at 81–84. He had no idea whether the cancellations were related to ethnic bias. *Id.* In fact, Mr. Diaz can not even make out a prima facia case because he can not identify any similarly situated non-Hispanic who was accepted into the classes. *Id.* at 84. ("Q: Are you claiming that non-Hispanics were getting those positions instead of you getting the position? A: I don't know who went...") Even if Mr. Diaz could make out a prima facie case he has presented no evidence that the legitimate reasons Mrs. Diaz mentioned were pretextual. Therefore, summary judgment is GRANTED with regard to Plaintiffs' Title VII claim, to the extent such claim is based on exclusion from training classes.

### 3. Old Equipment

 The Plaintiffs assert that when new cars and radar detectors were distributed they were given to less-senior, non-Hispanic officers. *See* Diaz Mem. Opp. Summ. J. at 14. With regard to new

patrol cars, Mr. Diaz admits that both times he was passed over for new cars, the cars were given to someone with more seniority. *See* J. Diaz Dep. at 44, 46. Thus, the Plaintiffs can not make out a prima facie case with regard to the new cars because they do not identify any similarly situated non-Hispanic (i.e. a white officer with less seniority who was given a patrol car.) Furthermore, they do not provide any evidence rebutting the Defendant's legitimate reason, that the new cars were distributed based on seniority. Finally, with regard to both of these claims, the Plaintiffs have not shown a "serious and material change in the terms, conditions, or privileges of employment" as required by *Davis*. Therefore, summary judgment is GRANTED with regard to Plaintiffs' Title VII claim, to the extent such claim is based on the Defendant's failure to timely update their equipment.

#### 4. Failure to Transfer

 Ms. Diaz argues that she attempted to transfer to a different County and was unable to for several years. *See* Diaz Mem. Opp. Summ. J. at 13–14. However, as discussed earlier, a failure to transfer only constitutes an adverse employment action if the new position entails an increase in pay, prestige or responsibility. *See Smith*, 145 F.Supp.2d at 1297. In the present case, Ms. Diaz has not alleged that the transfer to Miami–Dade County represented an increase in pay, prestige or responsibility. Therefore, this failure to transfer does not represent an adverse employment action for purposes of a prima facie case of discrimination in employment. Moreover, considering that Ms. Diaz was eventually transferred to Miami–Dade County she clearly can not meet the high

burden established in *Davis*. Additionally, Ms. Davis has provided no evidence that the Defendant's articulated legitimate reason, that it was short staffed in Monroe County, was pretextual. Therefore, summary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on the Defendant's failure to transfer the Plaintiff to Miami–Dade County.

#### 5. Hostile Work Environment

The Plaintiff's hostile work environment claim is based on the following allegations. First, a coworker informed Mr. Diaz that he heard Lt. Egeli refer to Mr. Diaz and his wife as "a bunch of lazy Hispanics." [6] Second, one of Mr. Diaz's coworkers, Trooper Henning, kept a "small size" Confederate Flag in the back seat of his car. *See* J. Diaz Dep. at 59–60. Third, Mr. Diaz was informed by a cowoker that the coworker observed Lt. Egeli drawing a swastika on his (Lt.Egeli's) desk at work. *See* J. Diaz Dep. at 70. Finally, Mr. Diaz was told that Trooper Henning told a civilian that he hates Jorge Diaz and his wife and he would like "to kick his ass." *See* J. Diaz Dep. at 61.

As stated earlier, In deciding whether a hostile environment was created factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. *See Edwards*, 49 F.3d at 1521 (citing *Harris*, 510 U.S. at 24–25, 114 S.Ct. at 372.) As for frequency, the Plaintiffs have pointed only to four examples of hostility, in the years they worked for the Defendant. Of those four examples, the Plain-

---

6. In his Memorandum dated February 26, 2001, Mr. Diaz indicates that an affidavit will be "forthcoming" as evidence of this com-

ment. *See* Diaz Mem. Opp. Summ. J. at 17. As of January 2, 2002, no such affidavit has come forth.

tiffs were only directly exposed to one of them. Therefore, the Court finds that the examples of workplace hostility were relatively infrequent. As to severity, the two comments and the alleged drawing of the swastika did not occur in front of the Plaintiffs and they have no independent knowledge as to whether either of these incidents even occurred. The "kick his ass" comment and the confederate flag, are not necessarily even related to race. With regard to the "kick his ass" comment Mr. Diaz admitted that he did not know why the comment was made. *See* J. Diaz Dep. at 66. Thus, the Court finds that the hostility was not that severe.

As to the third factor, the "threatening and humiliating quality" of the comments and symbols, they are limited by the fact that neither Plaintiff heard the comments or saw the swastika. They learned of them later from the reports of third parties. To this date, as far as the Court is aware, neither of these Plaintiffs have seen a swastika any where related to the Defendant. As to the "kick his ass" comment made by Trooper Henning, the threatening quality of the comment is further limited by the fact the Plaintiff testified that he "never run[s] into him." J. Dep. at 64–66. ("I saw him once in a blue;" "I never deal with him;" "I don't see them [troopers working in the South End of the County] for two or three years;" "we've only seen each other maybe three or four times.") Additionally, Trooper Henning works on the opposite end of the County from the Plaintiffs. *See Id.* at 64. Finally, the Diazs have presented no evidence that these comments interfered with their performance at work. Thus, the Diazs have failed to state a claim under the standards of *Harris*. Moreover, as in *Edwards*, hearsay problems exist with the Diazs' claim. *Edwards*, 49 F.3d at 1522. Therefore, summary judgment is GRANTED with regard to the Plaintiffs' Title VII

claim, to the extent such claim is based on a hostile work environment

### 6. Acts of Discipline

 Mrs. Diaz complains of four incidents during the last eight years with the Defendant in which she believes she was disciplined because of her race. First, Mrs. Diaz claims she received a written reprimand for leaving her zone without reporting the move. *See* W. Diaz Dep. at 9. Second, she claims she received a written reprimand for using the wrong radio to perform employment related tasks. *Id.* at 10. Third, she claims she received a written reprimand for not using the proper code when entering the County. *Id.* Fourth, she was exonerated in an investigation involving a car accident but she claims the Defendant "purposely" kept the incriminating document in her file. *Id.* at 106.

Mrs. Diaz' contention, however, is not supported by her disciplinary record, which includes no written reprimands. Her record indicates that she was exonerated from the car accident, no action was taken in two other incidents, and the only other action resulted only in "counseling." Moreover, in her Memorandum in Opposition to Summary Judgment, Mrs. Diaz' does not identify a single non-Hispanic similarly situated employee, who received lighter discipline for similar acts. Finally, "a negative performance evaluation which is not used as the basis for any action against a plaintiff does not constitute an adverse action." *Simmons*, 1999 WL 1893667, at *13 (S.D.Fla.1999). Mrs. Diaz does not allege that her disciplinary record was used as the basis for any action against her.

Mr. Diaz complains of only two acts of discipline in the course of his career with the Defendant. First, he complains that

he was given a written reprimand for failing to timely change his oil, while Office Tierney who was not Hispanic received no discipline for failing to timely recalibrate his radar detector, which Mr. Diaz believes is a more serious infraction. *See* J. Diaz Dep. at 19–21. Second, he claims he was reprimanded for failing to timely turn in traffic tickets. *Id.* at 22.

As to the first act of discipline, Mr. Diaz's disciplinary record reveals that no reprimand was ever recorded. As to the second act, Mr. Diaz has not identified a single non-Hispanic similarly situated employee, who received lighter discipline for a similar act. Additionally, Mr. Diaz, as his wife, does not allege that his disciplinary record was used as the basis for any action against him. *Simmons*, 1999 WL 1893667, at *13 (S.D.Fla.1999). Therefore, summary judgment is GRANTED with regard to the Diazs' Title VII claim, to the extent such claim is based being unfairly disciplined.

### 7. Off–Duty Work

Mrs. Diaz claims that the Defendant would not allow her to work off-duty jobs. *See* W. Diaz Dep. at 28–29. Although she claims that other non-Hispanic officers from her class were doing so, she can not make out a prima facie case because (a) she can not name a single non-Hispanic, similarly situated individual; and (b) she has presented no evidence that those individuals who were working off-duty were acting with the permission of the Defendant. Additionally, the Defendant presented a legitimate explanation for the decision which was that troopers were not allowed to do off-duty work when in the "training phase." *Id.* at 29. The Plaintiff has presented no evidence that the Defendant's explanation was pretextual. Mrs. Diaz actually admits that the restriction only lasted while she was in her

training phase. *Id.* at 30. Additionally, she admits that some of the officers who she claims were working off-duty were Hispanic. *Id.* at 29. Finally, it appears that Mrs.Diaz's training took place in 1993 and therefore occurred more than 300 days before she filed her EEOC complaint on July 20, 1997 and is therefore barred. *See DeLandro v. Jackson Memorial Hosp.*, 2001 WL 1622064 at *4 (S.D.Fla.2001). Therefore, summary judgment is GRANTED with regard to the Mrs. Diaz's Title VII claim, to the extent such claim is based on being denied the privilege of engaging in off-duty work.

### 8. Compensation for Commuting Time

In their Memorandum, the Diazs argue "All of these officers check in to work at the door step of their home, and check out when they get home. They work eight (8) hours [sic] shifts compared to Jorge and Wanda who are required to check in when they are in their work zone and check-out when they leave the work zone, accounting for a loss of approximately one and a half hours of non-compensated work." *See* Diaz Mem. Opp. Summ. J. at 15–16 (citations omitted). However, in Mr. Diaz's deposition he testified to the exact opposite. *See* J. Diaz Dep. at 141 ("Q: Do those troopers clock in from the door of their house? A: No, they don't...Q: How do they check in? A: They just sign in like I do.") More importantly, however, the Plaintiffs have not presented the Court with any similar situated non-Hispanic person. While the Plaintiffs have mentioned employees who were allowed to commute long distances, they have not stated nor have they presented any evidence that any of these people were paid for their commuting time. Thus, to the extent the Plaintiffs are complaining about a difference in compensation, they have failed to state a prima facie case. To the

extent the Plaintiffs are merely complaining that they had to use their radios to check in and out of zones while other troopers did not, the Plaintiffs have failed to show a serious and material difference in the terms, conditions, or privileges of employment as required by *Davis*. Therefore, summary judgment is GRANTED with regard to the Diazs' Title VII claim, to the extent such claim is based on a failure to compensate them for commuting time.

### 9. Removal of Letters of Commendation

Mr. Diaz complains that three of his commendation letters somehow ended up in the trash instead of in his file. *See* J. Diaz Dep. at 50–54. The Defendant's legitimate nondiscriminatory reason is that this must have been an accident. As evidence of this, the Defendant presents and Mr. Diaz does not dispute the fact that his file did contain three other letters of commendation. *Id.* at 54. Additionally, the only performance evaluation in Mr. Diaz's file is overwhelmingly positive. *Id.* at 147. The Defendant argues therefore, that Mr. Diaz's file is inconsistent with the theory that the Defendant is trying to prevent his advancement by meddling with his file. The Plaintiff presents no evidence that the Defendant's asserted legitimate nondiscriminatory reason is pretextual. The Plaintiff presents no evidence of who filed these letters in the circular file or why, other than his own opinion. Additionally, the Plaintiff has presented no evidence of a similarly situated non-Hispanic. For all the Plaintiff knows, this type of thing may happen routinely at FHP to employees of all races. Carelessness does not discrimi-

nate. Therefore, the Plaintiff is also unable to make out a prima facie case.

Finally, the Plaintiff has failed to show a serious and material change in the terms, conditions, or privileges of employment as required by *Davis*. As stated *supra*, "a negative performance evaluation which is not used as the basis for any action against a plaintiff does not constitute an adverse action." *Simmons*, 1999 WL 1893667 at *13. Analogously, the absence of a positive performance evaluation is not actionable unless the absence either prevents the plaintiff from obtaining a serious and material improvement in the terms, conditions, or privileges of employment or results in serious and material action taken against the Plaintiff. The Plaintiff has presented no evidence that the absence of these evaluations has or will prevent the him from obtaining a serious and material improvement in the terms, conditions, or privileges of employment or has resulted in actions taken against him. The Court thinks it is very unlikely that the lack of these commendations will hinder the Plaintiff's advancement considering that he has a number of commendations in his file and a very positive evaluation. Additionally, when it was brought to the attention of the sergeant, he copied and placed the missing commendations in Mr. Diaz's file. *See* Harrington Aff. at 8. Therefore, the adverse action complained of can not be sustained under the high standards of *Davis*.[7] If the Plaintiff's file was "poorly done and unsupported, it might be a poor way to run the . . . office, but it would not be actionable under Title VII." *Id.* at *14. Therefore, summary judgment is GRANTED with re-

---

7. To the extent Mr. Diaz intended this claim to be considered as part of his "Hostile Work Environment" claim, the Court must also GRANT summary judgment. The Plaintiff has presented no evidence that the conduct has interfered with his performance at work in any way. Additionally, he has presented no evidence that he found the conduct to be either "threatening or humiliating."

gard to Plaintiff's Title VII claim, to the extent such claim is based on the removal of letters of commendations.

### 10. Delay in Approving Residence

Mrs. Diaz claims that she was discriminated when she was required live in the Marathon area as opposed to anywhere within 30 miles of her patrol zone. *See* Diaz Mem. Opp. Summ. J. at 15. This situation was remedied on February 29, 1996, when she complained to Chief Austin. *See* W. Diaz Dep. at 31. As the claim arose and was completely resolved more than 300 days before the plaintiff filed her EEOC complaint on July 27, 1997, and does not represent a continuing violation, this claim is barred. *See DeLandro*, 2001 WL 1622064 at *4.

Moreover, Mrs. Diaz can not make out a prima facie case because she can not identify any similarly situated non-Hispanic employee. *See* J. Diaz. Dep. at 30 ("Q: Is there anyone that you know of that was not a Hispanic person who had a problem with the 30 mile rule or 30 mile radius, or an excerpt [sicwas exempt] from that particular provision? A: As far as I know, no one ever was allowed to do that. *We were the first ones.*") (emphasis added). The unspecified persons the Plaintiff mentions in her Memorandum all lived in different counties than the Plaintiff and worked for different counties than the Plaintiff. *See* Diaz Mem. Opp. Summ. J. at 15.

Finally, the Plaintiff here was simply asking the Defendant to make an exception to its general rule. *See* Letter by W. Diaz to Major T. Carrick dated March 10, 1995 (admitting her home was 38 miles from Zone 3 and 4) ("I request you consider this alternative.") The Defendant eventually made the exception, albeit with some delay. Thus, the adverse action complained of can not be sustained under the high standards of *Davis*. Therefore, sum-

mary judgment is GRANTED with regard to Plaintiff's Title VII claim, to the extent such claim is based on the delay in approving her residing more than thirty miles from her zone.

### III. *Orlando Alverez*

Mr. Alverez seems to be bringing two claims. First, he brings a disparate treatment claim based on his 6–month suspension and demotion, which he received as a result of violating certain employment policies. Second, he brings what appears to be a "hostile work environment" claim based on the approximately fifty derogatory comments which he was exposed to over the course of his 20 year employment.

### 1. Disparate Treatment Claim

 The Defendant argues that Alverez is estopped from making a disparate treatment claim based on the release he signed as a part of the negotiated settlement agreement. The settlement agreement states in ¶ 9:

> The Employee hereby releases and forever discharges the State of Florida, its elected officials, agents, employees and volunteers, including the Department of Highway Safety and Motor Vehicles, from all claims and demands, actions and causes of action arising under the laws of the State of Florida or the United States of America, and any and all damages, costs, expenses and compensation arising from the dismissal, separation, and suspension without pay and demotion of the Employee by the Agency.

 The Plaintiff argues that although he signed the release, it was not knowingly and voluntarily executed. In determining whether a release was knowingly and voluntarily executed, courts look to the totality of the circumstances. *See Puentes v. United Parcel Serv. Inc.*, 86 F.3d 196, 198

(11th Cir.1996). The *Puentes* case, which the parties agree is controlling, indicates that the Court should consider six factors: (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff considered the agreement before signing it; (3) the clarity of the agreement; (4) the plaintiff's opportunity to consult with an attorney; (5) the employer's encouragement or discouragement of consultation with an attorney; and (6) the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled. *Id.*

With regard to the first factor, the Plaintiff has a college education, a history of work experience including 20 years with this Defendant, has received management training, and has passed promotional exams for sergeant and lieutenant, as well as real estate and mortgage broker examinations. Thus, there is no question that this factor weighs in favor of finding a voluntary, intelligent waiver. *See e.g. Taylor v. Camillus House, Inc.,* 149 F.Supp.2d 1377, 1380 (S.D.Fla.2001).

As for the second factor, the Defendant concedes that the Plaintiff had approximately twenty four hours to consider the agreement before signing it. However, unlike *Puentes,* in which "the plaintiffs had no role in deciding the terms of the releases" and "none of the terms of the release were negotiated," here the Plaintiff authorized his union to negotiate the terms on his behalf, and the head of the union engaged in such negotiation days before the actual agreement was signed. Alverez 2001 Dep. at 37–39; *See Hayes v. National Service Industries,* 196 F.3d 1252, 1254 n. 1 (11th Cir.1999) (*Puentes* "is not the applicable standard when reviewing a case in which the employee (or former employee) was represented by an attorney who settled the matter on the employee's behalf.") While the head of the union was

not an attorney and he may not have been the one to finally settle the matter, his work negotiating as an agent of the Plaintiff should be considered in determining how long the Plaintiff had to consider the settlement.

Additionally, when PERC issued its "Final Order Approving Settlement Agreement" on September 20, 1996, three days after the Plaintiff signed the agreement, the order stated "This order may be appealed to the appropriate district court of appeal. A notice of appeal must be received by the Commission and the district court of appeal within 30 days from the date of this order...Alternatively, a motion for reconsideration may be filed. This motion must be received by the Commission within 15 days from the date of this order." Thus, although the Plaintiff had to sign the agreement within twenty four hours of when it was explained to him, he had over thirty days after in which he could have appealed it to the district court and more than fifteen days in which he could have sought reconsideration from the commission. The Plaintiff did neither despite the fact that he knew he could have taken his case to the court. Alverez 2000 Dep. at 94. In *Nero v. Hospital Authority of Wilkes County,* 86 F.Supp.2d 1214, 1229 (S.D.Ga.1998), the court found that the *Puentes* rule (that twenty four hours is too short absent some reason for urgency) does not apply where the agreement could be revoked within the next seven days. Similarly, we hold today, that the *Puentes* rule does not apply where an agreement can be appealed as a matter of right within thirty days and the Plaintiff chooses not to appeal.

As for the third factor, the agreement was completely clear. The agreement released "*all claims* and demands, actions and causes of action arising under the laws of the State of Florida or the United

States of America, ... arising from the dismissal, separation, and suspension without pay and demotion of the Employee by the Agency." (Emphasis added) *Cf. Bledsoe v. Palm Beach County Soil and Water Conservation District,* 133 F.3d 816, 819 (11th Cir.1998) ("The language of the release indicates that Bledsoe was only settling his claim for wage loss benefits under the workers' compensation law. There is nothing in the release that suggests or mentions a waiver of federal discrimination claims.") The only way in which the agreement could have been clearer, in this case, is if it specifically stated "this waiver includes your disparate treatment claim." However, the Plaintiff was well aware that the claim he had was one of disparate treatment. At his predetermination conference, three days before he signed his settlement agreement, the Plaintiff alleged that he was receiving disparate treatment. *See* Letter of June 24, 1996 from Major Wright to Colonel Grimming ("He [Alverez] also listed a number of disciplinary cases that related to off-duty employment and alleges that he is receiving disparate treatment based on past practice.") Thus, the Court finds that the agreement and the consequences which would naturally follow were clear.

The fourth factor refers to the Plaintiff's opportunity to consult with an attorney. In *Puentes,* the Court found that it was "undisputed that neither plaintiff consulted with an attorney before signing the releases." *Puentes,* 86 F.3d at 198. In the present case, the Plaintiff started consulting with his attorney about a week before the predetermination hearing (June 24th). *See* Alverez 2001 Dep. at 37. The Plaintiff spoke with his attorney about the settlement agreement over the telephone before

the actual day on which he signed the agreement. *Id.* at 39–40, 59–60. On the day on which he signed the agreement, he met with his attorney in a room provided by the Defendant. *Id.* at 40. The Plaintiff read the entire agreement. *Id.* at 61 ("Q:Did you actually sit down and read the piece of paper carefully to make sure it was what they told you it was? A: Yes.") When the Plaintiff agreed to sign the agreement, it was due, in part, to the advice of his attorney. *Id.* at 62 ("Q: A decision was based on the advice of your attorney regarding the chances of success in front of the hearing officer, correct? A: Correct.") The Plaintiff never requested more time to consult with his lawyer or requested to consult with a different lawyer. Thus, the Court finds that the Plaintiff had an adequate opportunity to consult with his attorney.

Fifth, the employer provided the Plaintiff with a meeting place for him to consult with his counsel. *See Id.* at 40. Other than this, the Defendant did nothing to either encourage or discourage consultation.

■ Finally, the only consideration the Defendant received from this agreement in exchange for rescinding the dismissal of this employee was the release contained in paragraph eight and nine of the agreement. The other paragraphs merely state the particular conditions of the Plaintiff's future employment.[8] *See* ¶¶ 2,3,4,6,7,12. The only other "benefit" the employer received at all from this settlement was the Plaintiff's agreement to return the $772.32 which the Plaintiff already "owed" the Defendant. *See* ¶ 5 ("The Employee agrees to pay back to the agency the amounts *owed* for overlap hours...") (emphasis added). Under Florida Law, the payment

---

8. The first paragraph just indicates that the agreement has been "freely and voluntarily reached." The tenth paragraph is a confidentiality agreement. The eleventh paragraph, states the agreement will not be considered department precedent.

of a preexisting debt does not constitute consideration. *See Air Prods. and Chem. Inc. v. Louisiana Land and Exploration Co.,* 806 F.2d 1524, 1529 (11th Cir.1986) (citing *City of Miami Beach v. Fryd Construction Corp.,* 264 So.2d 13, 15 (Fla.App. 1972).) Therefore, the Defendant exchanged this waiver for rescinding its dismissal of the Plaintiff.

The Court further finds that reinstatement was a fair consideration for the waiver in this case. The Plaintiff testified that he gets a great deal of satisfaction from his job and that he would rather have this satisfaction than more money. *See* Alverez 2000 Dep. at 104–105. Thus, it would be perfectly rational and consistent for the Plaintiff to choose the certainty of maintaining his job and the satisfaction that comes with it, rather than abandoning his job in order to spin the wheel and hope he lands on "disproportionately high jury verdict." Additionally, the Plaintiff's disparate treatment claim is not that strong on the merits as he can not identify another non-Hispanic employee who is clearly similarly situated, as his circumstances are somewhat unique. Thus, the six factors of *Puentes* all support the conclusion that the Plaintiff's waiver was knowing and voluntary.

■ The Plaintiff makes two other arguments why the Court should not enforce the settlement agreement. First, the Plaintiff argues that he signed the agreement under "duress." By "duress," however, the Plaintiff means that he was concerned about his economic situation. *See* Alverez 2001 Dep. at 61–62. However, it is well settled that this type of economic pressure does not constitute the type of "duress" which would allow someone to repudiate an otherwise valid agreement. *See e.g. Parker v. Key Plastics,* 68 F.Supp.2d 818, 826–27 (E.D.Mich.1999).

■ Second, the Plaintiff argues that the Defendant violated the settlement agreement. Specifically the Plaintiff asserts that the Defendant failed to perform paragraph seven of the agreement which reads: "The employee shall attend a personal meeting with the Director of the Florida Highway Patrol upon his return to duty on February 1, 1997." However, the law is clear that only material breaches of a settlement agreement justifies rescinding the agreement. (*See King v. Department of Nav,* 178 F.3d 1313, 1999 WL 37406 at *2 (Fed.Cir.1999)). "Not every departure from the literal terms of a contract is sufficient to be deemed a material breach." *Id.* (quoting *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1550 (Fed. Cir.1992)). A material breach "relates to a matter of vital importance, or goes to the essence of the contract." *Id.* (quoting *Thomas v. Dept. of Housing and Urban Dev.,* 124 F.3d 1439, 1442 (Fed.Cir.1997)). Materiality depends on "the nature and effect of the violation in light of how the particular contract is viewed, bargained for, entered into, and performed by the parties." *Id.* (quoting *Stone Forest,* 973 F.2d at 1551).

The Court finds that the breach complained of by the Plaintiff was not material. The "meeting" was a condition inserted by FHP and was never desired or requested by the Plaintiff. *See* Alverez 2001 Dep. at 97. The Plaintiff admits he has not been hurt in any way by the nonoccurrence of this meeting. *Id.* ("Q: Did it make any difference in the conditions of your employment whether that meeting took place, as far as you could tell?: A: No ... Q: Have you been harmed in any way by not having that meeting? A: No."). Additionally, the Plaintiff admits that to this day, he has never called about the meeting or otherwise requested that the meeting take place. *See* Alverez 2000 Dep. at 130–31.

Considering the following, the Court can not find this to be a material breach.

Therefore, because the Plaintiff's disparate treatment claims are barred by his effective waiver, the Court hereby GRANTS summary judgment as to this claim.

### 2. Hostile Work Environment

█ The Plaintiff's hostile work environment claim is essentially that he was called fifty derogatory comments over the past twenty years, an average of two or three per year. The fifty derogatory comments were not made directly to the defendant. *Id.* at 155. He claims, instead, that he overheard them. *Id.* The Plaintiff was unable to name even one of the individuals who made the derogatory comments. *Id.* The Plaintiff was unable to recall where these comments were made. *Id.* When asked whether he would have filed an EEOC charge were he not disciplined, as discussed *supra*, the Plaintiff stated "I wasn't going to make a complaint to the EEOC based on—with nothing." *Id.* at 153. Additionally, the Plaintiff admitted that these comments did not interfere with his ability to do his job or to succeed in the workplace. *See* Alvarez 2001 Dep. at 100. Therefore, under the *Edwards* factors the Plaintiff can not make out a claim based on hostile work environment and summary judgment is GRANTED with respect to this claim. *See Edwards,* 49 F.3d at 1521 (citing *Harris,* 510 U.S. at 24–25, 114 S.Ct. at 372.)

### V. *Pedro Cortes*

Pedro Cortes brings a disparate treatment claim, based on the fact that he was dismissed from work around the time that he pleaded *nolo contendere* to two counts of official misconduct and two counts of conspiracy to commit official misconduct. He also claims he was denied transfers, given run-down equipment, and was not assisted when his car broke down.

### I. Dismissal From Work

█ On November 15, 1996, as a result of an internal investigation, Pedro Cortes was relieved of all law enforcement duties and placed on administrative duty in his place of residence. On December 19, 1996, the State Attorney's Office filed a 17–count Indictment charging him with official misconduct, conspiracy to commit felony, and grand theft in the third degree. On April 18, 1997, Mr. Cortes was dismissed from work for the reasons stated in his indictment. On April 28, 1997, he filed a Motion to Dismiss for Selective Prosecution and requested an evidentiary hearing in his criminal case. On April 8, 1998, Mr. Cortes pleaded *nolo contendere* to two counts of official misconduct and two counts of conspiracy to commit official misconduct. On September 10, 1999, Mr. Cortes' criminal justice certificate was revoked by the state of Florida Criminal Justice Standards and Training Commission ( the "Commission"), as a result of the Plaintiff's plea. Mr. Cortes did not appeal the decision of the Commission.

Now the Plaintiff brings a disparate treatment claim alleging first that he received harsher treatment then those similarly situated because his violations of employment policies resulted in his dismissal rather than less severe discipline. However, the plaintiff does not dispute the fact that he plead *nolo contendere* to official misconduct and conspiracy to commit official misconduct. Further, Mr. Cortes does not dispute that Fla. Stat. § 943.13(4) demands that "any person who, after July 1, 1981, pleads guilty or nolo contendere to or is found guilty of any felony or of a misdemeanor involving perjury or a false statement is not eligible for employment or appointment as an officer." Thus, the De-

fendant was required by Florida law to dismiss the Plaintiff. While it is true that the Defendant dismissed the Plaintiff shortly before he actually pleaded, an indictment had already been filed charging him with seventeen counts. Mr. Cortes has not alleged that any of those who he claims are "similarly situated" had indictments issued against them for such serious crimes or any crime at all, for that matter, before they were disciplined. *See* Cortes Mem. Opp. Summ. J. at 14–15. Moreover, the other troopers which the Plaintiff mentions can not be considered similarly situated for a number of reasons discussed *infra.*

Cortes also claims disparate treatment based on his allegation of selective prosecution. However, the Plaintiff has presented no evidence that the Defendant had any control over the decision of the State Attorney to prosecute him. To the contrary, the Assistant U.S. Attorney who prosecuted the case stated:

> It is the Office of the State Attorney and only the Office of the State Attorney that makes the decision whether or not criminal charges are filed. Indeed, this A.S.A. would venture to say that virtually every assistant state attorney in this office has angered a police officer or another agency or a civilian by refusing to file a case that the officer or agency or civil wanted filed....It was the Office of the State Attorney that made the decision as to who would be charged and who would not be charged. *See* State's Resp. to Def's Mot. To Dismiss for Selective and Vindictive Prosecution, filed September, 23 1997 at 3–4.

█ Even if the Plaintiff had presented evidence that the Defendant had control over the decision of the State Attorney to prosecute him, that claim would be barred by collateral estoppel, because the issue was raised before the Florida Court and was implicitly rejected when they accepted the Plaintiff's plea of *nolo contendere.* In Florida, a defendant who is adjudicated guilty pursuant to a plea of nolo contendere is collaterally estopped from seeking affirmative relief or defending a civil theft claim that is based on the same conduct that gave rise to the prior prosecution. *See Starr Tyme, Inc. v.Cohen,* 659 So.2d 1064, 1068 (Fla.1995). Cortes is estopped as to all matters that necessarily were decided in favor of the State in the prior proceeding. *Id.* Clearly, the Fourteenth Amendment would prevent the Court from adjudicating the Plaintiff as guilty pursuant to a plea of nolo contendere, if the Court had found selective prosecution. Therefore, collateral estoppel would prevent the Plaintiff from raising the selective prosecution claim again. This rule is in accord with the rule in other states who have opined on similar issues. *See e.g., Kubik v. Brown,* 979 F.Supp. 539, 550 (W.D.Mich.1997) (Collateral estoppel barred § 1983 plaintiff from litigating claims for malicious and selective prosecution, where plaintiff had opportunity to litigate issues in state court criminal proceeding, but instead chose to plead guilty); *United States v. Cortez,* 973 F.2d 764, 767 (9th Cir.1992) (holding that guilty plea precluded defendant from challenging preplea selective prosecution claim); *People v. Robertson,* 279 A.D.2d 711, 718 N.Y.S.2d 463, 464 (N.Y.A.D. 3rd Dept.2001).

In order to avoid the fact the Defendant in this case is not the one who took the adverse action, the Plaintiff argues that the Defendant selectively brought some cases to the attention of the State Attorney and choose not to alert them to others. However, in order to make a prima facia case based on this claim, the Plaintiff must show a non-Hispanic employee who was similarly situated but who the Defendant did not bring to the attention of the State

Attorney. The Plaintiff has only alleged one other non-Hispanic person who committed "serious" violations and yet the Defendant did not contact the State Attorney's Office (Trooper John Underwood).[9] *See* Cortes Mem. Opp. Summ. J. at 14.

However, the only evidence that the Plaintiff presents to show that the State Attorney's Office was not contacted in the case of Trooper Underwood is the deposition testimony of one of the Plaintiffs who had nothing to do with investigation of employees. *See* Cortes Mem. Opp. Summ. J. at 14. To the contrary, the Assistant U.S. Attorney involved stated: "As was the long standing practice of the Investigations Unit and the Public Corruption Unit of the State Attorney, *whenever FHP had evidence that a crime may have been committed,* the lead officer would contact an assistant state attorney." *See* State's Resp. Def.'s Mot. Dismiss at 2 (emphasis added.) Therefore, the Plaintiff has failed to create a triable issue as to whether the Defendant engaged in disparate treatment by selectively informing the State Attorney's Office of violators.

 Even if it was true that the Defendant failed to inform the State Attorney's Office of the violations of all of the individuals the Plaintiff mentions, the Plaintiff would still be unable to make a prima facie case because the individuals the Plaintiff mentions are not similarly situated. The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts

from second-guessing employers' reasonable decisions and confusing apples with oranges." *Diaz v. Florida Highway Patrol,* 31 Fed.Appx. 932 (11th Cir.2002) (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999)). First, the violations many of the other troopers were charged with were quite different.[10] Second, the number of individual omissions concerning off-duty police work that this Plaintiff allegedly committed was "far in excess of any of the enumerated troopers" the Plaintiff presents. *See* State's Resp. Def.'s Mot. Dismiss at 5. Third, the Plaintiff has presented no evidence that the troopers he mentions were charged with working with or enabling any other trooper to violate department directives and criminal statutes. *Id.*

Fourth, while Cortes was a trooper, other employees mentioned were of higher ranks within the department (e.g. Sergeant Freeburn, Lieutenant Folsom). *See* Harrington Aff. at 8, 13. Fifth, many of these other employees were working under different supervisors in different troops (e.g. Freeburn, Adams, Folsom, Gainer, Giles, Underwood.) *Id.* at 8,9,12,13,16. Sixth, in some cases, the ultimate discipline troopers received was the result of a settlement (e.g.Adams, Folsom, Hernandez). *Id.* at 9, 12. Seventh, the violations that some of the other "similarly situated" individuals engaged in also resulted in them having to leave the force permanently (e.g. Folsom was forced to retire as a condition of settlement, Gainer resigned

---

9. The Plaintiff mentions eight other "similarly situated" individuals, however he does not allege or present any evidence that the State Attorney's Office was not contacted with regard to these individuals. In fact, it is clear that the State Attorney's Office was contacted in at least five of the cases. *See* Cortes Mot. Dismiss for Selective And Vindictive Prosecution, filed August 28, 1997 at 17–18 (Sam Fulson), 22, 24–25 (Sgt.Freeburn); State's Resp. to De.f's Mot. To Dismiss at 6 (Rodney Adams), 9 (Jose Hernandez); Harrington Aff. at 13 (James Gainer)

10. For instance, Scott Trahaan was arrested for dealing steroids. *See* Cortes Mem. at 15; Rodney Adams stole checks from a church mailbox. *Id.* at 14; Trooper James Gainer was charged with theft. *Id.* at 15; Eric Curuthers was stealing gasoline. *Id.*

before FHP determined the level of his discipline.) *Id.* at 12, 13. Eighth, Cortes admits that Hernandez was Hispanic. *See* Cortes Mem. Opp. Summ. J. at 15. Finally, the Plaintiff has not alleged nor has he presented any evidence that the evidence against the other troopers was as compelling as the evidence against him. *See* State's Resp. Def's Mot. Dismiss for Selective and Vindictive Prosecution at 4.

Thus, the Court must GRANT summary judgment with regard to this claim because (1) the Plaintiff can not show other non-Hispanics who had indictments pending against them and were otherwise similarly situated yet were not dismissed; (2) the Plaintiff can not show that the decision to prosecute was made by the Defendant both because he has presented no evidence and because he is collaterally estopped; (3) the Plaintiff has failed to raise a triable issue of fact as to whether the Defendant selectively informed the State Attorney's Office of violations; and finally (4) the Plaintiff has failed to present evidence of any similarly situated individuals.

### 2. Other Claims

Mr. Cortes claims that there was a delay in issuing him a patrol car when he initially started working and that newer cars were given to non-Hispanic employees. These two claims are barred because they occurred more than 300 days before Cortes filed his EEOC complaint and do not represent continuing violations. Moreover, he can not identify any similarly situated employee with regard to the delay in issuing him a patrol car. Finally, neither adverse action represents a serious or material change in employment under the standards of *Davis*.

With regards to Cortes' claim that it took him two and a half years to get a lateral transfer and was not assisted when his car broke down, neither claims represent a serious or material change of employment under the standards of *Davis*, and the Plaintiff has not named any similarly situated employee. Therefore, the Court must GRANT summary judgment with regards to Trooper Cortes' other claims.

### VI. *Angelo Santisteban, Henry Gonzolez and Alejandro Diaz*

Mr. Santisteban, Mr. Gonzolez and Mr. Diaz base their disparate treatment and retaliation claims on their dismissal from the Florida Department of Highway Patrol, and a variety of other minor "adverse actions."

### 1. Dismissal

■■■ These three Plaintiffs were formally dismissed from the FDHP for violations of employment policies (i.e."stealthing"). Mr. Santisteban was dismissed on September 22, 1997. Mr. Gonzalez and Mr. Diaz were dismissed on August 5, 1997. On August 19, 1997, having already been dismissed or informed that they would be dismissed, they filed an appeal with PERC. A five-day hearing was held. During that hearing the Commission was required to consider "action taken with respect to similar conduct by other employees" and Plaintiffs' counsel presented evidence of milder punishments given to over twenty different employees. *See* Fla. Stat. § 447.208(3)(d)(1). On February 3, 1998, the hearing officer entered a 23 page "Recommended Order Affirming Agency's Action." The hearing officer found, in part, "The major distinguishing feature between the conduct by the Employees and the conduct in the above referenced cases in that here the conspiracy is the focal point of the conduct. This is the first case faced by the Agency where employees are engaged in a conscious scheme to deceive the Agency. As a case of first impression

for the Agency, dismissal of conspiratorial employees would not constitute a firmer stance toward disciplining employees who violate the off-duty police employment policy." *See* Recommended Order Affirming Agency's Action at 19–20.

On March 20, 1998, Mr. Gonzalez and Mr. Santisteban filed "Employees' Exceptions to Hearing Officer's Recommended Order" which stated in part "There is clearly disparate treatment, reasons for which are unknown to undersigned counsel. Perhaps it is the Hispanic origin of the Employees involved in this case. That is the only difference between the Employees involved in this case and a majority of the cases presented to the Commission at the hearing and in their Exceptions." *See* Exceptions at 21. On April 28, 1998, the PERC entered a Final Order Affirming the Hearing Officer's Recommended Order and finding no disparate treatment. The Commission distinguished some cases because of the absence of conspiracy, some did not involve off-duty violations, and one was deemed inadmissible because it was a negotiated settlement. *See* Final Order at 9. The Commission found the Plaintiffs were "not similarly situated to the Employees because the Employees engaged in misconduct different in its duration and character." *Id.* at 10.

The Plaintiffs appealed the Final Order to Florida's Third District Court of Appeals. The main contention on appeal was the PERC's decision to exclude evidence of Jose Hernandez case, because it was the result of a settlement agreement. The Plaintiffs did not argue that they had been denied a fair hearing nor did they mention other FDHS employees. The Third District Court of Appeals affirmed PERC's Final Order, *per curiam,* on December 30, 1998. *See Diaz, et. al v. Dept. of Highway Safety and Motor Vehicles,* 727 So.2d 931 (Fla. 3d DCA 1998).

It is clear that a Federal court must apply the law of the forum state on the question of issue preclusion, including in Title VII cases. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). It is also well established in Florida that a state court's decision upholding an administrative body's findings has preclusive effect in a subsequent federal court proceeding if: (1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process. *Barrington v. Florida Dept. of Health,* 112 F.Supp.2d 1299, 1304 (M.D.Fla.2000); *Maniccia v. Brown,* 171 F.3d 1364 (11th Cir.1999); *City of Bartow v. Public Employees Relations Comm'n,* 382 So.2d 311, 313 (Fla.Dist.Ct.App.1979.) It is of no consequence that the state has ruled on discrimination in the context of a different legal proceeding. *Barrington,* 112 F.Supp.2d at 1304. "For instance, if an employee alleges discrimination during a hearing to review her termination, and a state tribunal upholds the administrative agency's rejection of that claim, a subsequent Title VII action may be barred." *Id.* (citing *Burney v. Polk Community College,* 728 F.2d 1374 (11th Cir.1984).)

Under Florida law, the following elements must be established before the Courts of this state would apply collateral estoppel and be bound by the decision of the PERC and the Third District Court of Appeals: (1) the issue at stake must be identical to the one decided in the prior litigation; (2) the issue must have been actually litigated in the prior proceeding; (3) the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and (4) the standard of proof in the prior action must have been at least as stringent as the standard of proof in the

later case. *Barrington*, 112 F.Supp.2d at 1304; *In re Yanks*, 931 F.2d 42, 43 n. 1 (11th Cir.1991); *In re Halpern*, 810 F.2d 1061, 1064 (11th Cir.1987).

In both this case and the state case, the issue was whether the Plaintiffs received disparate treatment. This issue was vigorously litigated in the PERC hearing, and appealed to the State Court. The determination that the Plaintiffs did not receive disparate treatment was the focal point of the PERC's decision. The Plaintiff has presented no evidence that the standard of proof in the previous action was any different than the standard of proof in the present action. Moreover, the Plaintiff has not argued that the state proceedings that produced the decision failed to comport with the requirements of due process.

In fact, despite having full notice of the Defendant's argument, the Plaintiffs have utterly failed to address the issue and have presented no argument as to why collateral estoppel or res judicata should not apply.[11] *See* Gonzalez Mem. Opp. Summ. J. Moreover, even if collateral estoppel did not apply, the Plaintiff has presented no evidence which would prevent this Court from independently reaching the same conclusion. Therefore, this court must GRANT the Defendant's Motion for Summary Judgment with respect to the Plain-

tiffs' disparate treatment claim to the extent that it is based on dismissal.

With regards to the Plaintiffs' retaliatory discharge claim, they can not make out a prima facia case because they can not show that a casual connection exists between their EEOC complaint and dismissal. This is because the Plaintiffs each received a letter advising them of their pending dismissals days before they filed their first EEOC complaint. Additionally, the Plaintiffs can not show that the Defendant's legitimate nondiscriminatory explanation is pretextual because that issue has already been decided against them by a Court of competent jurisdiction. *See* discussion *supra.* Therefore, this court must GRANT the Defendant's Motion for Summary Judgment with respect to the Plaintiffs' disparate treatment claim to the extent that it is based on retaliatory discharge.

#### 2. Other Claims

Mr. Santiesteban claims: (1) he was required to remove a small Cuban flag; (2) was denied admission to a training program; (3) was disciplined for having an unclean vehicle and (4) was disciplined for not checking in before leaving for a lunch break. *See* Gonzalez Mem. Opp. Summ. J. at 17, 19–20. These claims involve "adverse actions" that occurred more than 300

---

**11.** The Plaintiffs' entire response to the Defendant's argument that collateral estoppel applies can be easily disposed of. The Plaintiffs state (without any citation to a case involving collateral estoppel) that it is improper to apply collateral estoppel to federal (Title VII) claims based on a state court decision since a violation of Title VII should be determined through consideration of only federal law. *See* Gonzalez Mem. Opp. Summ. J. at 15. The Plaintiffs simply have misinterpreted the law. *See e.g. Barrington v. Florida Dept. of Health,* 112 F.Supp.2d 1299, 1304 (M.D.Fla.2000) Moreover, even if a state court were incapable of applying federal law, the

Defendant is arguing in essence, that this Court give collateral estoppel effect to the *factual* findings of the PERC and Third District Court of Appeals. These findings, which were actually litigated and decided, were that the Plaintiffs did not receive disparate treatment from others who were punished for "similar" violations and that the other "similarly situated" employees cited by Plaintiffs were not similarly situated at all. The Plaintiffs have presented no evidence of anything in federal law which might cause a federal court to answer this factual question differently.

days before he filed his EEOC charge and can not be considered continuing violations. Moreover, they do not represent "serious and material" changes in employment as required by Davis. The only official discipline the Plaintiff ever got was for failing to check in before leaving for a lunch break in "95 or 96." *See* Santiesteban Dep. at 85–88. Finally, with regard to several of these claims, the Plaintiff does not specify any similarly situated non-Hispanic. Therefore, this court must GRANT the Defendant's Motion for Summary Judgment with respect to Mr. Santiesteban's remaining claims.

Mr. Gonzalez claims: (1) he was denied a lateral transfer; (2) a crowd yelled "kill the pig" at him; and (3) his Sergeant canceled back-up assistance to him when he was engaged in dangerous activities. *See* Gonzalez Mem. Opp. Summ. J. at 21, 24. All of these incidents occurred more than 300 days before Mr. Gonzalez filed his EEOC complaint and are thus barred. With regard to Mr. Gonzalez's claim that a crowd yelled "kill the pig," Mr. Gonzalez does not claim that these civilians were state actors or were in any way associated with the Defendant and therefore the claim is not actionable. Additionally, none of the three "adverse actions" represent serious and material changes in the terms, conditions, or privileges of employment,

and thus are not actionable under the standards of *Davis*.

Mr. Diaz claims: (1) that he was subject to racist comments "before he was hired by FHP;" (2) he was denied lateral transfers; (3) he was subject to a hostile environment under Sgt. Roundtree; (4) he was given older equipment; (5) he was unable to seek promotions because of his "papered" disciplinary record.[12] *See* Gonzolaz Mem. Opp. Summ. J. at 20–21. With regard to the Plaintiff's first three claims, they occurred more than 300 days before Mr. Diaz filed his EEOC complaint, and do not represent continuing violations. Thus the claims are barred. Additionally, with regards to the Plaintiff's first four claims, they do not represent serious and material changes in the terms, conditions, or privileges of employment, and thus are not actionable under the standards of *Davis*. With regards to the Plaintiff's claim that he was unable to seek promotions because of his "papered" disciplinary record, the Plaintiff admits both that he never sought any promotions, that he has never seen his file and has no idea whether it has been "papered." *See* Diaz Dep. at 43, 147. Clearly Mr. Diaz has failed to present a triable issue as to whether it was "futile" for him to apply for promotions. Considering this, the Court must GRANT the Defendant's Motion for Summary Judg-

12. The Plaintiffs make a general argument in this case that the Defendant and the Court is doing each Plaintiff a disservice by examining each one of his alleged acts of discrimination individually, instead of looking at them on the aggregate. However, after eliminating those claims which are untimely filed, waived by settlement agreement, and barred by collateral estoppel, this Court can confidently state that, even when aggregated, the remaining claims of each Plaintiff are too minor, sporadic and indirect to be actionable. The alleged acts were performed by different supervisors, in different troops, over a ten to twenty year period. The acts were performed infrequently and the Plaintiffs do not even remember when most of the acts occurred. Most of the Plaintiffs have no direct knowledge of many of the acts of which they complain. None of the Plaintiffs' job performance suffered significantly as a result of these acts. Therefore, while the Court discusses each "adverse action" individually for clarity, organization and completeness, the Court assures the Plaintiffs that its result would have been the same had it discussed all the Plaintiffs claims as aggregated.

ment with respect to the Plaintiff's remaining claims.

## VII. EEOC Charge

■ Besides all of the specific reasons discussed *supra*, summary judgment must also be granted with regards to all of the Plaintiffs' cases because their EEOC charge lacked specificity. *See Lieberman v. Miami–Dade County*, 2000 WL 1717649 at *3–4 (S.D.Fla.2000). In *Lieberman*, the Plaintiff brought a harassment claim, however, in terms of harassment, her EEOC charge stated only "In regard to the discrimination and significant loss of salary and benefits, the Department Head and his subordinate staff created a hostile work environment through constant and invidious harassment." *Id.* at *3. The Court stated:

> *Ms. Lieberman's Charge only mentions that she was harassed without giving specific instances of harassment or dates of harassment. Thus, she did not make specific allegations of harassment that would have warned the County of the harassment and given the EEOC an opportunity to provide administrative relief. Furthermore, while a court should apply a "liberal" standard when considering the relationship between an EEOC charge and a judicial complaint, a claimant's lack of specificity in an EEOC Charge precludes the claimant from later seeking judicial relief... The Court does not find it unreasonable to require some additional specificity and detail as a condition precedent to successfully maintaining a harassment claim. Id.* at *4.

Additionally, the *Lieberman* Court cited *Rush v. McDonald's Corp*, 966 F.2d 1104 (7th Cir.1992), for the proposition that an EEOC charge reading "I believe I was discriminated against because of my race, Black" was insufficient to maintain a race discrimination claim. *Id.* In the present case, each Plaintiff's EEOC charge is identical and reads in its entirety: "As a Florida Highway Patrol (FHP) Law Enforcement Officer I have been discriminated against by my employer and their representatives in violation of the Civil Rights Act of 1964, Title VII, as amended 42 U.S.C.2000(e). The discriminatory acts have occurred because of F.H.P.'s disparate treatment of hispanic (sic) officers." As in *Lieberman*, no Plaintiff has mentioned any specific instance of discrimination. Thus, under the standards of *Lieberman*, the Plaintiffs' EEOC charge lacks the necessary specificity and detail to successfully maintain this suit.

## VIII. State Law Claims

Because there are no remaining federal claims, this Court declines to exercise supplemental jurisdiction over the Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3); *Raven v. Oppenheimer & Co., Inc.*, 74 F.3d 239, 241 (11th Cir.1996); *Stefiuk v. First Union Nat. Bank of Florida*, 61 F.Supp.2d 1294, 1295 (S.D.Fla.1999).

### *Conclusion*

The Court has granted summary judgment to all of the Plaintiffs claims because they either failed to state a prima facie case, were unable to present any evidence that the Defendant's legitimate nondiscriminatory explanation was pretextual, or the Plaintiffs' claims were untimely filed, barred by collateral estoppel, waived by settlement, or not "significant and material" changes in employment. Additionally, each of the Plaintiffs' EEOC charge lacked the requisite specificity. It should not be inferred from this order, however, that the

Court believes that none of the supervisors at the Florida Department of Highway Safety and Motor Vehicles harbored racially motivated animosity towards Hispanics. To the contrary, based on the evidence presented, this Court believes that some supervisors probably did harbor animosity and at times acted on such animosity. The Plaintiffs' allegations, however, fail to meet even the minimal requirements necessary to bring a Title VII action.

Therefore, having been advised in the premises, it is hereby ORDERED AND ADJUDGED that the all of the Defendant's Motions for Summary Judgment in this case, are GRANTED for the reasons stated in this order. Additionally, the Defendant's Motion for Sanctions Against the Plaintiff is hereby DENIED. The Plaintiff's Motion for Reconsideration of Order Granting Default is DENIED. Finally, consistent with the Court's ruling from the Bench, the Defendant's Motion for an Order Compelling Discovery is GRANTED, although the issue is now moot as final summary judgment has been granted.